IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

**DEBBIE KOEHNKE.**                              Civ. No. 6:23-cv-00819-AA

            Plaintiff,                           **OPINION AND ORDER**

    v.

**UNUM LIFE INSURANCE COMPANY
OF AMERICA**

            Defendant.

_____

AIKEN, District Judge:

      The Employee Retirement Income Security Act ("ERISA") provides that an ERISA plan "participant" may bring a civil action in federal court "to recover benefits due to [them] under the terms of his plan, to enforce [their] rights under the terms of the plan, or to clarify [their] rights to future benefits under the terms of the plan[.]" 29 U.S.C. § 1132(a)(1)(B). Plaintiff Debbie Koehnke, a participant in an employee welfare benefit plan established by her former employer, Morrow Equipment Company ("Morrow"), brings this civil action to challenge the decision made by

Defendant Unum Life Insurance, denying her long-term disability ("LTD") benefits under the terms of the plan. Before the Court are the parties' opposing motions for judgment on the administrative record, ECF Nos. 26 and 28. The Court finds this matter appropriate for resolution without a hearing. *See* Fed. R. Civ. P. 78.

For the reasons explained, the Court

## BACKGROUND

The factual findings are discussed below in detail. As introduction, Plaintiff has long suffered from a degenerative disc condition in her lower spine, a condition confirmed by repeated MRI scans and X-rays. After slipping and falling on ice in February, her condition was aggravated. Plaintiff left her desk job and applied for and received short-term disability benefits. Plaintiff eventually applied for long-term disability benefits, which Defendant denied. Plaintiff then unsuccessfully availed herself of Defendant's administrative appeals process.

Plaintiff argues that she is disabled from her "regular occupation" and "all occupations" due to her injuries and illness, which include severe and chronic low back pain, fibromyalgia, hip pain, a seizure disorder, and sedation from her prescribed medications. She argues that she cannot perform the material and substantial duties of her job, or any job for which she is qualified. Plf. Br. at 4.

Defendant refutes Plaintiff's claim that she is disabled under the terms of its policy, arguing that she improperly exaggerates her medical condition. Def. Resp. at 2. Defendant also challenges the reliability of Plaintiff's treating physicians. Def. Br. at 17–21. Defendant asserts that Plaintiff's treating physician is not reliable because

(1) the physician did not initiate the suggestion that Plaintiff stop working; (2) medical exam notes documented that Plaintiff presented to her exams in "no distress" and "without significant abnormalities"; and (3) her treating physician merely endorsed Plaintiff's reported symptoms. *Id*. For those reasons, Defendant urges the Court to afford greater weight to its own specialists who reviewed Plaintiff's medical records. Def. Resp. at 17. Defendant also asserts that Plaintiff's claim for disputed benefits arising under the "any occupation" of the plan is not properly before the Court, only her claim for benefits under the "regular occupation" definition of the plan.

## LEGAL STANDARDS

ERISA allows a plan participant to recover benefits due to them under the terms of the plan, to enforce their rights under the terms of the plan, or to clarify their rights to future benefits under the terms of the plan. 29 U.S.C. § 1132(a)(1)(B). District courts review a plan administrator's denial of benefits "under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). The parties agree that the Court should review Defendant's benefits decision *de novo*. Def. Br. at 16-17; Plf. Br. at 3.

Under *de novo* review, "'[t]he court simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits.'" *Opeta v. Nw. Airlines Pension Plan for Cont. Emps.*, 484 F.3d 1211, 1217 (9th Cir. 2007) (quoting *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006)). The review is limited

to the evidence before the plan administrator except "when circumstances clearly establish that additional evidence is necessary to conduct an adequate *de novo* review." *Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan*, 46 F.3d 938, 943 (9th Cir. 1995).

Moreover, when the parties elect to proceed under a Federal Rule of Civil Procedure 52 motion for judgment, the court essentially conducts "a bench trial 'on the papers.'" *Kieserman v. Unum Life Ins. Co.*, 574 F. Supp. 3d 896, 900 (W.D. Wash. 2021) (quoting *Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 124 (2d. Cir. 2003)). That is, the court will ask "not whether there is a genuine issue of material fact, but instead whether [the claimant] is disabled within the terms of the policy." *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1094–95 (9th Cir. 1999). It may then "evaluate the persuasiveness of conflicting testimony and decide which is more likely true." *Id.*

Thus, the court may make factual findings, evaluate credibility, and weigh the evidence before it to determine whether the administrator correctly or incorrectly denied benefits. *See Anderson v. Liberty Mut. Long Term Disability Plan*, 116 F. Supp. 3d 1228, 1231 (W.D. Wash. 2015). Similarly, the court must make reasonable inferences where appropriate. *Oldoerp v. Wells Fargo & Co. Long Term Disability Plan*, 12 F. Supp. 3d 1237, 1251 (N.D. Cal. 2014). In turn, the court need not give deference to the claim administrator's decision. *Muniz v. Amec Const. Mgmt., Inc.*, 623 F.3d 1290, 1295–96 (9th Cir. 2010). A plaintiff challenging a benefits decision under 29 U.S.C. § 1132(a)(1)(B) bears the burden of proving entitlement to benefits by a preponderance of the evidence. *Id.* at 1294.

## FACTUAL FINDINGS

### A.    Plaintiff's Medical Background

1.    In 2004, Plaintiff established care with Kaiser Permanente in Oregon. She had a history of seizures, fibromyalgia, knee pain with occasional flareups, and a diagnosed subluxation of the patella on the femur. (AR 1473, 2870, 2877, 2884). Plaintiff's prescribed medications included Dilantin, Ultram, and Alprazolam. (AR 2880, 2884).

2.    In January 2006, Plaintiff reported chronic pain from fibromyalgia and reported her pain management as "stable." (AR 2857).

3.    In August 2006, Plaintiff was involved in an accident where she was thrown off a jet ski traveling at 55 miles per hour. (AR 2886). After the accident, she reported to her physician low back pain and was prescribed over-the-counter anti-inflammatory medication. (AR 2850). However, after a few days, Plaintiff presented to the emergency room with intense pain that radiated through the left leg to her ankle and was treated with Toradol and morphine injections and prescribed oxycodone. (AR 2846).

4.    An MRI showed that Plaintiff had multilevel degenerative disc disease at the L1-2 and L4-5 level of her spine and a superior disc extrusion at the L4-5 "with associated deformity of the left ventral aspect of the thecal sac and marked narrowing of left lateral recess with also contact of the left exiting L4 nerve root." (AR 2841). Plaintiff's physician reported that she appeared in pain and had difficulty standing upright. *Id.*

5.      Six weeks after her jet ski accident, Plaintiff underwent spinal surgery for what her neurosurgeon described as a "quite large L4-5 herniated nucleus pulposus on the left." (AR 2820).

6.      In August 2007, Plaintiff presented for care for her seizure disorder. (AR 2806-10). Her physicians also noted tender points in her body consistent with fibromyalgia and that she had been taking Ultram for pain management for more than five years without the need to increase the dosage. (AR 2802, 2807–08).

7.      In April 2010, Plaintiff reported to her doctors an increase in her back pain that included numbness, tingling, and weakness in the lower extremities, down her thigh, past the knee, and across the shin. (AR 2695). Plaintiff's primary care physician, Dr. Catherine Chester, prescribed Plaintiff hydrocodone-acetaminophen to add to her medication regimen and referred to physical therapy. *Id*.

8.      In August 2010, Plaintiff visited Dr. Chester after she had been experiencing low back pain for three weeks, possibly onset after she had done some weeding and gardening. (AR 2672). Dr. Chester's notes document Plaintiff's report that it was painful for her to sit for prolonged times at work. *Id*. She was prescribed physical therapy as well as muscle relaxant medication in conjunction with an NSAID. *Id*.

9.      At Plaintiff's first physical therapy appointment, she reported that she had been avoiding sitting and most activities to reduce her pain, which was exacerbated by sitting, standing, and prolonged walking. (AR 2653–54).

10.    In July 2011, Plaintiff saw a rehabilitation specialist, Dr. Maureen Carney, for numbness in her left leg and bilateral leg pain. (AR 2616–18). Dr. Carney documented Plaintiff's report that she felt she could do "hardly any activity for long," and must "frequently stop to recover" from "aching, burning, throbbing pain." *Id.* A lumbar MRI was ordered, given Plaintiff's history of back surgery. Her rehabilitation specialist noted that Plaintiff was "at risk for spinal stenosis and some of her symptoms are supportive of this. If that is not demonstrated on imaging, I do not think I would have another recommendation for her." *Id.*

11.    Plaintiff's 2011 MRI revealed that Plaintiff's degenerative disc condition had not improved at all since the pre-surgery condition of her injury in 2006. Specifically, her condition showed "increased moderate left L4-L5 neural foraminal narrowing," and "[m]ultilevel degenerative disk disease elsewhere [that] is not substantially changed compared to 2006."

12.    In May 2012, Plaintiff reported to Dr. Chester ongoing low back pain and sciatica, explaining that it was growing steadily worse with aching and sharp pain that sometimes radiated to her left leg and caused a numb sensation. (AR 2603). Concerned about interactions between her anti-depressant medication and pain medications, Dr. Chester prescribed gabapentin to replace Plaintiff's fluoxetine prescription. *Id.* However, Plaintiff reported that the gabapentin made it difficult to think, so she therefore only remained on tramadol and hydrocodone-acetaminophen. (AR 2588).

13.    In February 2013, Plaintiff's physicians documented continued back pain, along with pain in Plaintiff's upper back, neck, elbows, hips, and knees, associated with fibromyalgia pain. (AR 2577). Her medication was changed to Cymbalta. (AR 2580).

14.    In April 2013, Plaintiff took time off work, reporting intolerable back pain, and realized that her back seemed to feel better when she was not sitting for extended periods. (AR 2555).

15.    In May 2013, Plaintiff was working six hours a day and had increased her walking. (AR 2542). Her doctor prescribed her a fentanyl patch to help with pain. *Id.*

**B.    Plaintiff's Medical Record During Employment at Morrow Equipment**

16.    Plaintiff started a new job as a Document Control Manager for Morrow Equipment, beginning September 29, 2014, to May 15, 2021. (AR 002, 228).

17.    In November 2014, Dr. Ulrike Guempel became Plaintiff's primary care provider. (AR 2512).

18.    Dr. Guempel documented Plaintiff's history of fibromyalgia and her and reports of having "ups and downs,'" "'good days, bad days, and really bad days,'" and noted that she "[t]ries to push through the bad days." *Id.* The 2006 surgery had provided "relief of her low back pain for approximately 3 years," but "[w]ith time pain has slowly recurred," such that "[a]t this point she is unable to stand or sit for a prolonged time of greater than 1 hour," and "[b]est if she can move around every 30

minutes or so." *Id.* Plaintiff's pain was being treated with tramadol (or Ultram) and norco, plus oxycodone for more severe pain, which she needed 2 or 3 times a year. *Id.*

19.　　In June 2015, Plaintiff went to urgent care for radiating low back pain. (AR 2478). Her physician noted that Plaintiff had chronic back pain, and that Plaintiff reported feeling that the pain had been "exacerbated without inciting factor." *Id.*

20.　　In July 2015, Plaintiff visited Dr. Guempel who documented that Plaintiff experiences flares of low back pain and that "no one thing [ ] triggers the flares other than prolonged sitting[.]" (AR 2473). Dr. Guempel also documented that Plaintiff has four small grandchildren and that Plaintiff lifts them and sits on the ground to play with them. *Id.*

21.　　Dr. Guempel advised Plaintiff to try a workstation that included a sit to stand desk. *Id.*

22.　　In August 2015, Plaintiff's back pain became severe, and she reduced her work hours to four per day for two weeks. (AR 2459).

23.　　In October 2015, Plaintiff went to urgent care for increased low back pain with radiation to lower abdomen. (AR 2451). Doctors told Plaintiff to avoid sitting and bending. (AR 2450–51). Plaintiff remained on opiate medication for chronic pain. (AR 2410, 2394, 2386, 2378, 2368).

24.　　In May 2016, and again in June 2018, Dr. Guempel called Plaintiff to manage her medications and discuss adjunctive care for chronic back pain. (AR 2410, 2403, 2350).

25.     In April 2018, Plaintiff reported to Dr. Guempel "My spine is killing me[.]". (AR 2230).

26.     In February 2019, Plaintiff took extra pain medication to tolerate driving to Astoria, Oregon, to visit her mother who had suffered a stroke. (AR 2124). Because Plaintiff had taken more medication than initially allowed by her provider, she agreed to a monitoring and information sharing plan with Dr. Guempel if pain flares caused her to need increased medication. *Id.*

27.     In June 2019, Plaintiff was partially disabled by a "flare of her fibromyalgia and increase in chronic low back pain." Thus, she took time off work and was approved for short-term disability benefits. (AR 2106).

28.     In late July, Plaintiff returned to work full-time for about five weeks but was not able to sustain that schedule due to her low back pain. (AR 2097). She reduced her work hours to part-time again. *Id.* Accordingly, Dr. Guempel authorized Plaintiff to return to part-time work for the remainder of her short term disability benefit period "to allow her to decide if she wants to remain on the job at all." *Id.*

29.     Plaintiff was devoted to her job and enjoyed going to work. (AR 2887, 2890, 2895).

30.     In March 2020, during the COVID-19 pandemic, Plaintiff returned to a full-time schedule working remotely from home. (AR 2045). She anticipated that being able to change positions frequently would allow her to continue to work, but she found that it did not. She told Dr. Guempel, "sitting is my worst [n]emesis," and

that she could not sit for more than 20 minutes without her back pain becoming unbearable. *Id.*

31.    Even with these challenges, Plaintiff's employment review for 2020 stated that Plaintiff exceeded expectations and that she maintained a high level of expertise. (AR 2896-2906)

32.    In October 2020, Plaintiff became a patient at Kaiser's Sunnybrook Spine Center. (AR 1979, 1986). There, an MRI from October 2020 was compared to an MRI taken in 2013. (AR 1925) The comparison showed:

  a. Progressive degenerative changes at L3-4, with new left lateral recess stenosis, worsened moderate left neuroforaminal stenosis, and unchanged mild right neuroforaminal stenosis. *Id.*

  b. Progressive L5-S1 facet degeneration, with unchanged mild right and minimal left neural foraminal stenoses. *Id.*

  c. Unchanged L4-5 posterior decompression, degenerative disc disease and facet degeneration, and mild to moderate right and moderate to severe left neural foraminal stenoses. *Id.*

  d. Unchanged L1-2 small disc bulge. No stenosis. *Id.*

33.    Plaintiff took on physical therapy sessions in November and December of 2020 with Megan Swift, D.P.T. (AR 1953–55, 1943–46, 1932-35, 1916–19). Her therapist noted that Plaintiff's progress had been poor, and progress was slow. (AR 1918). Her therapist also noted that further physical therapy was not recommended, due to low pain tolerance. *Id.*

34.    On December 24, 2020, Plaintiff received an epidural steroid injection for pain relief. (AR 1924–26).

35.    In February 2021, Plaintiff slipped on ice and fell on two different occasions. (AR 1869, 1888). These accidents greatly exacerbated her pain. *Id.*

36.    In April 2021, Plaintiff told Dr. Guempel that she was considering taking a leave from work due to ongoing low back and bilateral hip pain. (AR 1875). Dr. Guempel documented that sitting for 20 to 30 minutes exacerbates lower back pain and standing more than fifteen minutes exacerbates her bilateral hip pain. *Id.* Dr. Guempel approved medical leave/short term disability from mid-May through mid-August 2021 due to Plaintiff's chronic pain, which was exacerbated by both sitting and standing. (AR 1860).

37.    In May 2021, Dr. Guempel let Plaintiff know that it was unlikely that another surgery would successfully treat her back pain, evaluating and explaining to Plaintiff the relevant literature and findings. *Id.* Dr. Guempel did not think that the risk-to-benefit ratio for spinal surgery would be appropriate. *Id.*

38.    Dr. Guempel approved medical leave from mid-May through mid-August due to Plaintiff's chronic pain, which was exacerbated by both sitting and standing. (AR 1860). Plaintiff took her leave from work beginning May 13, 2021.

## C.    Plaintiff's Medical Record During the Elimination Period

39.    In June 2021, x-rays showed degenerative changes in Plaintiff's spine. (AR 1340). That same month, an electromyography to measure the electrical activity of Plaintiff's muscles and nerves came back unremarkable. (AR 266–67).

40.     In August 2021, an MRI showed increased deterioration: "At L4-5, left greater than right facet arthropathy is slightly increased [from 2020]. In combination with a small posterior disc osteophyte ridge, this likely causes impingement of the traversing left L5 nerve root." (AR 1504).

41.     On August 11, 2021, Plaintiff discussed with Dr. Guempel an extension of her disability leave. (AR 1834). Dr. Guempel noted, "it remains unclear what the next steps in her care will be and how long the process of arranging the treatment plan will take. Says she is unable to return to work until she has some type of resolution of her symptoms." *Id.*

42.     On August 23, 2021, Physician Assistant Ryan Cate examined Plaintiff and documented no "tenderness, swelling, or tender trigger points," and a negative straight leg raise test. (AR 441). PA Cate, however, adjusted Plaintiff's pain medication doses and noted, "Patient needs to be on continued disability[,] she has a[n] epidural injection scheduled for the 30th[,] will then need to reassess after 2 weeks[,] may need follow-up with neuro surgery if not improving." (AR 284).

43.     On August 30, 2021, Plaintiff had another epidural steroid injection, but did not experience relief. (AR 290). PA Cate examined her the next day and documented that Plaintiff had "some nerve root compression" on her left side. (AR 292).

44.     On September 23, 2021 Plaintiff saw internist Dr. Tin Zar Aung, who documented that Plaintiff has pain with standing and sitting. (AR 294).

45.    In October, Plaintiff began the process to request long term disability benefits, completing the proper claimant form and noting that she was unable to sit or stand for long intervals because, "as pain escalates" she loses focus and cannot concentrate on her tasks. (AR 52).

46.    Plaintiff had been on medical leave or short-term disability since May 13, 2021, her last day of work. (AR 58). Between May 15, 2021, and November 10, 2021, Plaintiff had at least eight office/video visits related to her back pain and/or medication management with Dr. Guempel. (AR 4776).

47.    Plaintiff's elimination period ended November 10, 2021. (AR 464).

## D.    Dr. Guempel's Opinion in Support of LTD Claim

48.    The Court finds the opinion of Dr. Guempel highly credible and persuasive, given her in-person treatment history and direct examinations of Plaintiff, spanning back to 2014. Dr. Guempel had had the opportunity to evaluate Plaintiff's character and credibility over seven years. She was in an ideal position to determine whether or not Plaintiff was disabled.

49.    In support of Plaintiff's LTD claim, in November 2021, Dr. Guempel submitted an Attending Physician Statement ("APS") to Defendant. (AR 97-99). In the APS, Dr. Guempel noted the following restrictions: "Sitting for 20-30 minutes at a time exacerbates her lower back pain and standing for >15 mins exacerbates her bilateral hip pain." (AR R 98). Dr. Guempel indicated the primary condition impacting Plaintiff's functional capacity was "lumbar radiculopathy." (AR 97). "Bilateral hip

pain" was Dr. Guempel's secondary diagnosis. *Id.* Dr. Guempel stated she did not know how long these restrictions would last. (AR 98).

50.    The APS form includes the question, "What diagnostic or clinical findings support" the patient's restrictions?" *Id.* Dr. Guempel wrote "Lumbar spine MRI 9/1/21 with evidence of facet arthropathy L4-L5 likely causing impingement of the traversing left L5- nerve root." *Id.*

51.    In response to the request to provide documentation of the treatment plan leading up to the disability determination, Dr. Guempel noted ongoing treatment of lumbar radiculopathy, with "[n]o improvement in symptoms despite [multiple] different treatment modalities, including PT, acupuncture, chiropractic care, epidural steroid [injection] x 2." *Id.* Dr. Guempel noted that Plaintiff was currently taking Duloxetine, Methocarbamol, and Percocet for pain management and had been evaluated by neurosurgery and surgery not "felt to be indicated at this time." *Id.*

52.    In conjunction with Plaintiff's appeal, Dr. Guempel again opined that Plaintiff had experienced increasing and debilitating pain. Dr. Guempel stated that Plaintiff had "worked diligently to control her lower back and hip pain with physical therapy, a massage chair, an inversion table, acupuncture, and medications," and that none of those interventions had given Plaintiff sufficient pain control. (AR 1322).

53.    In the same opinion, Dr. Guempel stated that if Plaintiff returned to work, she would "miss multiple days of work every month" due to pain and that she would be "unable to complete a full day's work without extended breaks to allow her

to lie down in between brief periods of sitting." *Id.* Dr. Guempel also agreed with the FCE evaluation, stating that Plaintiff "does not have the physical capacity to be a productive and reliable employee." *Id.*

**E.    Unam LTD Policy and Claim Review**

54.    Under Defendant's policy, "disability" is defined as being limited from performing the material and substantial duties of an employee's "regular occupation," or, after 24 months, the duties of "any occupation" they are qualified to perform. (AR 466). An employee must be continuously disabled for 180 days from their date of disability. This period is referred to as the elimination period and must be satisfied before any LTD benefits may become payable. *Id.* The policy requires that a person must be "continuously disabled through [the] elimination period." *Id.*

55.    In October, 2021, Plaintiff completed Defendant Unum's LTD claimant form stating that she was not able to "sit[] for long intervals, stand[] for long intervals, as pain escalates I lo[]se focus and am unable to concentrate on any tasks required." (AR 52). As noted, Plaintiff's claim was submitted for "lumbar radiculopathy and bilateral hip pain" by Dr. Guempel, who had certified Plaintiff as disabled. (AR 464).

56.    Defendant interviewed Plaintiff. (AR 186-191). In the interview, Plaintiff describes the difficulty she has managing constant pain. (AR 186–87). She described her baseline level of pain as a 4 or 5 out of 10, that goes up to 8 out of 10 when "she does too much or sits too much." (AR 188). Plaintiff identified her pain as the only barrier preventing a return to work. (AR 189).

57.     Defendant consulted with its own physicians to review Plaintiff's medical records. Its consulting physicians did not exam Plaintiff in person.

58.     Defendant's medical consultant, Dr. Rosemary Szollas, asked Dr. Guempel if Dr. Guempel agreed that Plaintiff did not have "restrictions precluding [her] from performing her light occupational demands on a full-time basis...beyond 11/11/21," pointing to the fact that Plaintiff's "job activities" include "occasional" walking and "frequent," sitting and standing, and that her "position allows changes in position to adjust for comfort." (AR 437).

59.     Dr. Guempel responded that she did not agree with the statement and explained that Plaintiff had worked from home for two years "with the opportunity to sit, stand, or lie down as needed" without any lessening of pain from doing so. (AR 438). In Dr. Guempel's view, "allowing for positional changes in the actual work place would likely also not be beneficial." *Id.*

60.     Defendant's vocational representative, Gabriella Vargas, reviewed Plaintiff's claim. (AR 256). She characterized Plaintiff's occupation as "Document Control Clerk Engineering," and wrote that the occupation required standing or walking more than 15 minutes, and that "[i]f only able to stand 15 mins at a time, [Plaintiff] would not be able to perform document processing for distribution with reasonable continuity." Further, Ms. Vargas wrote that that even "alternating between sitting (20-30 min) with positional change to standing for at most 15 min would impact the worker's ability to perform job tasks with reasonable continuity." (AR 256).

**F.    Defendant's Denial of Benefits**

61.    On January 25, 2022, Defendant sent Plaintiff notice that it denied Plaintiff's claim for benefits, stating, "We have determined you are not disabled according to the policy and benefits are not payable." (AR 463).

62.    Defendant provided its reasons for the denial, summarizing its consulting physician's review of Plaintiff's medical record, which it asserted does not support Plaintiff's claim that she is disabled.

63.    Defendant stated that Plaintiff's "light" occupation as a Document Control Manager "require[s] frequent sitting and occasional standing and walking," and that the "duties of this occupation would allow for changes in position for brief periods of time throughout the day." (AR 464). According to Defendant, "positional changes would be within the occupational demands." (AR 465).

64.    Defendant acknowledged Dr. Guempel's determination—that frequently changing from sitting to standing would not be beneficial—but responded that its own physicians disagreed with that assessment. (AR 465–66).

65.    Defendant had two board certified occupational medicine physicians review Plaintiff's medical records, and based on the records, determined Plaintiff "could perform the light occupation duties on a full-time basis." (AR 464). The file reviewers were Dr. Szollas and Dr. Zachary Gross. (AR 440-44, 452-54). Defendant drew from Dr. Szollas' and Dr. Gross's opinions in reaching its decision.

66.    Defendant pointed out that Dr. Aung's September 23, 2021, exam notes state that Plaintiff "exhibited no tenderness, palpable spasm, or pain on motion." *Id.*

67.    Defendant referenced Ryan Cate's exam findings on August 23, 2021, where he documented that Plaintiff "ambulated without assistance, had no difficulty moving on or off the examination table, or changing positions or rising from a chair." Further, that "the straight leg test bilaterally was negative." (AR 465). Despite the notes also documenting that "[r]ange of motion at the back described pain with flexion and left sided tenderness and spasm of the lumbar paraspinal muscles," Defendant determined that PA Cate's "exam findings would not be expected to impact functionality at the light occupational demand level." *Id.*

68.    As to Plaintiff's visit with Dr. Kaul on August 5, 2021, Defendant pointed to a few of Dr. Kaul's general exam notes, including that Plaintiff's "[c]ranial nerves [were] intact" and that there were "[n]o deficits of the upper extremities." Defendant acknowledged that Dr. Kaul also found "tenderness" in Plaintiff's "right trochanteric posterior" and "hypesthesia in the left S1 region." *Id.* Despite the fact that Plaintiff had never complained about her cranial nerves or upper extremities, and only complained of low back pain, Defendant stated that Dr. Kaul's "findings" would not be expected to impact Plaintiff's occupational functionality. *Id.*

69.    Additionally, Defendant notes that MRI readings of the lumbar spine showed an "L4-5 arthropathy with a small posterior disc osteophyte ridge that was likely causing impingement of the left L5 nerve root. *Id.* However, Defendant focused on Dr. Kaul's interpretation of the MRI, pointing out that Dr. Kaul wrote that the MRI "may show a left L5 lateral recess stenosis but difficult to be sure, the moderate to severe left neural foraminal stenosis does not fit well with her current symptoms."

*Id.* The exam, however, was related to Dr. Kaul's EMG at Dr. Guempel's request to rule out Meralgia Paresthetica. *See* (AR 266) (noting Dr. Kaul's "further study: recommendations and referral notes). Reading the exam notes in full context, Dr. Kaul's note explains that the MRI would be a good symptom imaging match for when Plaintiff was experiencing the numbing and tingling in her left anterior shin. At any rate, the note Defendant points out does not discredit Plaintiff's L5 radiculopathy.

70.    Defendant also based its denial on the fact that Plaintiff had reported to Dr. Aung that she did not have pain walking, but she had pain with sitting and standing, and that Plaintiff told Dr. Aung that it could be related to her fibromyalgia. (AR 465). Moreover, that a neurosurgical evaluation determined surgical intervention unwarranted; medications were stable; and as noted, An EMG study did not correspond to symptoms of Meralgia Paresthetica. *Id.*

71.    According to Defendant's physician's review, described in ¶¶ 66–70, Plaintiff could have returned to the "full-time material and substantial duties" of her regular occupation as of May 15, 2021. *Id.*

72.    The Court finds that basis for denial was drawn from medical exam notes cherry-picked by Defendant's physicians from Plaintiff's medical record, and that many of the cited-to exam notes were not relevant to the lower back pain of which Plaintiff complained and on which she based her claim. The summarized physician's review in Defendant's denial letter singles out generic exam notes that describe how Plaintiff generally appeared at her visit, while ignoring or dismissing relevant clinical

findings and diagnostics that support her complained of symptoms. The summarized physician's review also takes certain exam notes out of context.

**G.    Plaintiff's Appeal of Administrator's Decision**

73.    After Defendant denied Plaintiff's claim for disability, she continued to receive medical care and present for physical exams.

74.    On March 30, 2022, occupational therapist Christina Cassady administered a functional capacity evaluation ("FCE") that lasted nearly four hours. (AR 3629). The FCE measured productivity levels on "work sample activity, limited sustained activity tolerances for sitting, standing, and walking, and compromised functional body mechanics posture." *Id.* The FCE found that Plaintiff, even using "high" effort, could not perform a sedentary occupation, and that Plaintiff's limitations were consistent with that of a "sub-sedentary" work tolerance. *Id.* Further, Plaintiff was determined unable "to sustain gainful vocational activity on a reasonably-continuous basis."

75.    On April 21, 2022, Plaintiff saw Dr. Guempel one last time before Dr. Guempel retired, complaining of pain exacerbated by the FEC testing. (AR 1685). Dr. Guempel reviewed the FCE report, and a letter Plaintiff wrote for Dr. Guempel. Dr. Guempel signed the letter for Plaintiff in support of Plaintiff's disability appeal. (AR 1321–22).

76.    In May, Plaintiff established care with her new primary care doctor, Dr. Lina Tanako. (AR 1677-80). Dr. Takano had an extensive discussion with Plaintiff about her medications, including finding alternatives to narcotic prescriptions. (AR

1679). Dr. Takano also provided a letter confirming the restrictions on Plaintiff's ability to work and the pain caused by her low back degenerative disc problems. (AR 4803).

77.   Plaintiff's family provided statements describing Plaintiff before and after chronic low back pain.

78.   Her husband described her active life, and that, as time went on, "the pain and time to recover forced her to make extreme changes to what she did," and that she "can't do near the things she used to do." (AR 2889-90)

79.   Plaintiff's son, a law enforcement officer, described his mother as "one of the strongest and hard-working persons I know," explaining that Plaintiff had a high level of activity and engagement before the onset of chronic pain:

> My father has bought her a very expensive massage chair and she takes medication, but it only nips at the issues. She will always fight and put on a good face, but there is no doubt she is simply limping along, trying to be a fun grandma, while masking the pain and issues she is enduring. She can only stand or walk for short durations before having to sit. Once seated she can only be seated for short durations before having to lay down. She struggles throughout the day with pain, and by the end of the night she often has to go to bed early from having to cope with the struggle. She often has to sit out on many of our family vacation activities. (AR 2891-92).

80.   Plaintiff's daughter-in-law describes Plaintiff as "highly functioning" and attests to her energy, stamina, and persistence in seeking out ways to overcome the "debilitating" pain, lamenting that Plaintiff must sometimes "stay behind and miss out because she can no longer participate." (AR 2893-94). She recalled a family party where Plaintiff could not "move from a sitting position" and had "tears streaming down her face." *Id.*

81.    Plaintiff appealed Defendant's denial in July 2022. (AR 1306–20). Plaintiff provided Dr. Guempel's April 2022 letter, (AR 1321–22); updated medical records (AR 1323–2885); the FCE Report (AR 3627–42); Dr. Takano's letter (AR 4803); Kaiser's updated medical records (AR 4804–5115); MRI reports (AR 5116–18); Plaintiff's own supplemental statement addressing Dr. Green's opinion that Plaintiff does not suffer severe pain. (AR 5128).

82.    In August 2022, Defendant obtained additional reviews by Drs. Szollas and Gross. (AR 2927–36, 2939–41).

83.    Dr. Szollas reviewed the medical record dating back to 2006, along with the new information Plaintiff submitted and found no change from her previous opinion. (AR 2928). Dr. Szollas's findings were not different than those summarized in Defendant's first denial letter. She concluded that "physical exam findings do not support that [Plaintiff] is precluded from performing the occupational demands" of her job. (AR 2932). She opined that "findings at the lumbar spine have been described as relatively benign by her treating [physicians]." (AR 2933). She reasoned that surgical intervention was not recommended, medication regimen remained stable, including her opioid regimen, and that Plaintiff had worked fulltime for many years with reported low back pain. (AR 2933–34). Dr. Szollas also did not credit the FCE, stating that Plaintiff's "documented exam findings" over the years were "not consistent" with the limitations stated in the FCE. (AR 2933).

84.    The Court gives Dr. Szollas' opinion some weight but finds that it gives more credit to less relevant examination findings and less credit to pertinent

diagnostics in the same exam—findings and determinations that are relevant to Plaintiff's complained of pain. Dr. Szollas does not provide a rationale for discrediting Plaintiff's subjective reports of pain. In citing Plaintiff's successful work history despite chronic pain, Dr. Szollas does not explain why long-term treatment for a *degenerative* condition that has not improved renders Plaintiff's reported symptoms not credible. The opinion that Plaintiff's physical exams were "benign" cannot be squared with a medical record that includes MRIs in July 2011, March 2013, October 2020, and August 2021 that identified degenerative disc disease, facet arthropathy, bone spurs, and nerve root impingement. (AR 1504, 2618–19, 1925, 1418–19)

85.    Dr. Gross reviewed the new records Plaintiff submitted, including past records, stating "my previous decision remains unchanged." (AR 2940). Dr. Gross stated that the most "pertinent information" was that Plaintiff's exams had been "normal exams." *Id.* (referring to five appointments between May 2021 and April 2022 where the exam notation so stated). Dr. Gross rationalized that "there are no clinical findings present in the available records to support the degree of the claimant's self-reported impairment." *Id.* Or, in Dr. Goss' opinion, to support Dr. Geumpel's "restrictions and limitations" opinion that Plaintiff could not perform the essential duties of her occupation. *Id.* Further, Dr. Goss determined that there have been "no findings of significant pain behavior," and Plaintiff's medications have been "stable." *Id.*

86.    The Court gives Dr. Gross's opinion some weight but finds that Dr. Gross cited as "most pertinent evidence" Plaintiff's physicians' "normal exam" notation

without discussing evidence in the record containing objective imaging. Nor does Dr. Gross's opinion explain how Plaintiff's diagnosed condition could not cause Plaintiff's chronic pain at the level Plaintiff reports. To say that there were "no clinical findings" to support Plaintiff's reported symptoms, when the record as a whole documents a intensive management of a degenerative disease leads the Court to find Dr. Gross's opinion not persuasive.

87.    In October 2022, Defendant obtained a file review by in-house Appeals Physician, physiatrist, Dr. Green, and in December, Defendant obtained an addendum by Dr. Green. (AR 4630–35, 5156–59).

88.    Like the opinions of Drs. Szollas and Gross, Dr. Green also cites from Plaintiff's medical record exam notations that have little bearing on the complained of problem. For example, Dr. Green pointed to findings that Plaintiff was "not a surgical candidate," or that her physician "did not endorse pain with walking," and that there were "no reports of over-sedation or adverse effects to medication." (AR 4634). Further, Dr. Green cites to notations about Plaintiff's general appearance at exams, such as "speaks in simple sentences, with no distress" as evidence discrediting that Plaintiff does not suffer from chronic pain. (AR 5158). The opinion also cites to evidence that Plaintiff had traveled at least four times during the elimination period. (AR 4634).

89.    The Court gives Dr. Green some credit, but his opinion is not persuasive for the same reasons Drs. Szollas and Green's opinions are not. Evidence that is not relevant is cited and credited, and evidence that includes objective imaging and

clinical findings that support Plaintiff's reported symptoms is not. Further, with respect to travel, Dr. Green's opinion does not take into account that Plaintiff reported to have good days and bad days, and that a few occasions of travel are not the same as engaging daily in an activity that causes flareups of pain, such as Dr. Guempel noted. (AR 438) (allowing for positional changes in the *actual work place* would likely also not be beneficial).

90.     Because each reviewing physician references that Plaintiff is not a surgical candidate as evidence weighing against Plaintiff's reported symptoms, the Court finds that the record contains Dr. Guempel's reply to Plaintiff regarding possible outcomes of surgical intervention. (AR 1860). It includes an explanation that "back pain is rarely successfully treated surgically." *Id.* The Court finds that this explanation, in context, means that surgery would be unlikely to provide relief for Plaintiff's symptoms of chronic pain—not that Plaintiff does not experience pain.

91.     Based on the above-described physician reviews, Defendant's final denial letter dated January 23, 2023 (AR 5191–5202), concluded: "It was determined [Plaintiff] can perform the duties of their occupation. Your client was not disabled according to the LTD and LWOP policies through the required elimination periods and benefits were not payable." (AR 5193).

## LEGAL CONCLUSIONS

### A.     Plaintiff has Proven she is Disabled by Preponderance of the Evidence

The policy's disability provision states that Plaintiff is deemed disabled if she is "limited from performing the material and substantial duties of [her] regular

occupation due to [her] sickness or injury" and has "a 20% or more loss in [her] indexed monthly earnings due to the same sickness or injury." (AR 125).

Dr. Guempel's restrictions from sitting for 20 to 30 minutes at a time and standing for more than 15 minutes (AR 98) is highly credible and supported by the medical record as a whole. Defendant's allowed "positional changes" were evinced as insufficient to provide relief from the requirement to sit and stand, which is required as a substantial part of Plaintiff's regular occupation. See (AR 256) (Defendant's vocational representative stating that those limitations "would impact the worker's ability to perform job tasks with reasonable continuity.").

Based upon an exhaustive review of the administrative record here, the Court finds Plaintiff has established by preponderance of the evidence that she was disabled under Defendant's definition of disability.

## B.    Plaintiff's Subjective Symptom Testimony Must be Credited

Subjective evidence of pain must be properly weighed and cannot be ignored. *See Schramm v. CNA Fin. Corp. Insured Grp. Benefit Program*, 718 F.Supp.2d 1151, 1163 (N.D. Cal. 2010) (a "Defendant's attempt to discount Plaintiff's subjective reports of pain is not supported by Ninth Circuit precedent."); *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 872 (9th Cir. 2008) ("individual reactions to pain are subjective and not easily determined by reference to objective measurements.").

Defendant wrongfully discounted Plaintiff's subjective symptom testimony. Defendant describes Plaintiff's symptoms as "self-reported," and discredits it as

proper evidence that her pain is disabling. *See* Def. Mot., pp. 12, 16, 21, 25. The factual findings include that Defendant's reviewing physicians discredited Plaintiff's subjective symptom testimony of chronic pain in contradiction to objective medical evidence in the record without providing a reasonable explanation for doing so.

Based on her uncontested diagnosis of lumbar radiculopathy and bilateral hip pain, and her own statement about the degree of her subjective symptoms, the corroborating statements of her treating physician who examined Plaintiff for over seven years, and objective clinical imaging, Plaintiff has presented credible evidence by preponderance of the record of a condition that could reasonably be expected to cause her chronic pain. Her condition restricts her from performing the substantial duties of her occupation. Defendant has failed to rebut Plaintiff's evidence.

## C.    Evidence that Plaintiff Traveled is Insufficient to Discredit Plaintiff's Subjective Symptom Testimony

Evidence in the record is that Plaintiff had to obtain additional medication to travel (AR 2124) and statements from her family was that Plaintiff experienced reduced activity when traveling (2894, 2890), and that the family has had to adjust to her chronic pain management needs. Defendant raised, for the first time in its administrative appeal decision, that Plaintiff's testimony about pain is discredited by the four times she traveled during or around the time of the elimination period. (AR 5194-97).

Courts have found that reference to a claimant's travel, alone, is not sufficient to establish a conflict with Plaintiff's testimony. *Santos v. Colvin*, 2015 WL 3886939, at *6 (C.D. Cal. June 24, 2015). *See also Chalfant v. Astrue*, 2011 WL 61612, at *6

(C.D. Cal. Jan. 6, 2011) ("[P]laintiff's vacation to Hawaii does not inherently negate her allegations of pain and other symptoms . . . Nor is it apparent from plaintiff's testimony about her trip that she spent a substantial part of her time performing any physical task that translates to the work environment") (citation omitted).

Accordingly, absent specific findings as to *how* Plaintiff's travels undermine her credibility, the conclusion is not persuasive.

### D.  *Plaintiff's Treating Physician's Determination is Credible*

Defendant asserts that Dr. Guempel's restrictions supporting Plaintiff's claim for disability benefits are not credible, because Plaintiff requested the disability determination and because it conflicts with the medical record as a whole. Def. Br. at 17–21.

As found by the Court, the record includes evidence of an injury from the jet ski accident, the spinal surgery, MRIs, x-rays, the FCE, Dr. Takano's opinion, four witness statements, and intensive pain management through medications prescribed by Dr. Guempel. Defendant's reasons for discrediting Dr. Guempel's restrictions are not supported by law or fact.

The only medical providers who questioned the veracity or severity of Plaintiff's symptoms are Defendant's reviewers. Defendant's reviewers never saw Plaintiff in person. There is no treating physician rule' in ERISA cases. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)). That is, the Court need not give special deference to treating physicians over those who conducted reviews. *Hamid v. Metro. Life Ins. Co.*, 517 F. Supp. 3d 903, 916–17 (N.D. Cal. 2021). But this

does not preclude a district court, engaging in *de novo* review, from evaluating and giving appropriate weight to a treating physician's conclusions, where reliable and probative. *Reetz v. Hartford Life and Accident Ins. Co.*, 294 F. Supp. 3d 1068, 1083 (W.D. Wash. 2018)).

Here, especially given the subjective nature of Plaintiff's reported pain, the Court chooses to give weight to the opinions of Dr. Guebel, Plaintiff's treating provider, who treated Plaintiff for seven years. Dr. Guebel saw in real time the symptoms Plaintiff described and did not contest it—instead, she prescribed medications, ordered imaging, sent out referrals, and responded to Plaintiff's complaints of pain.

### E.    Claim Under "Any Occupation" is Not Properly Before the Court

Plaintiff asks the Court to find that she is unable to engage in her "regular occupation" and "full time occupations" altogether. Plf. Br. at 6-7. Defendant asserts that it did not review or decide whether Plaintiff is disabled from performing the duties of other gainful occupations outside of Plaintiff's regular occupation. *See* (AR 125) (defining two-tiers of "disabled"). Plaintiff does not respond to Defendant's argument.

"ERISA and its regulations require plans to provide certain pre-suit procedures for reviewing claims after participants submit proof of loss (internal review)." *Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99, 105 (2013). The LTD plan at issue includes claims procedures and an administrative appeal process. (AR 149-151).

"[C]ourts of appeal have uniformly required that participants exhaust internal review before bringing a claim for judicial review." *Heimeshoff* at 105.

The Court agrees with Defendant that its benefits decision does not address the "any gainful occupation" standard, nor does the Complaint. The administrative record is not developed on that question. Plaintiff's request for reinstatement of benefits beyond the date of judgment is not properly before the Court. Defendant's motion for judgment is granted with respect to this issue.

## CONCLUSION

Plaintiff bears the burden of showing by a preponderance that she was disabled within the meaning of the plan and was therefore entitled to LTD benefits. The Court finds that Plaintiff has met this burden. Thus, the Court GRANTS Plaintiff's Motion for Judgment, ECF No. 28. The Court GRANTS Defendant's Motion in Part and DENIES Defendant's Motion in Part, ECF No. 26, consistent with this opinion. The Court holds that Plaintiff was disabled within the meaning of the policy with respect to her "regular occupation" and is entitled to receive LTD benefits. The parties shall meet and confer regarding the amount of benefits owed and any interest, and jointly submit a proposed judgment within sixty (60) days of the date of this Order. Plaintiff's request for attorney's fees under 29 U.S.C. § 1132(g) must be filed no later than 14 days after the entry of judgment as required by Federal Rule of Civil Procedure 54(b)(2).

It is so ORDERED

Dated this 19th day of September 2025.

_____/s/Ann Aiken_____

Ann Aiken
United States District Judge